Clyde P. BAETEN, James R. Benson, Charles C. Bidwell, and others similarly situated, Plaintiffs,

v.

Anthony J. VAN ESS, Audrey R. Morgan, Leonard Anderson, Jane Hamilton, Daniel C. Beisel, Richard Timm, Green Bay Newspaper Company Profit Sharing Plan, and Green Bay Newspaper Company, Defendants.

No. 75–C–555.

United States District Court,
E. D. Wisconsin.

Aug. 10, 1979.

**1326**

Goldberg, Previant & Uelmen by Richard M. Goldberg and Howard L. Janco, Milwaukee, Wis., for plaintiffs.

Welsh, Trowbridge, Planert & Shaefer by F. N. Trowbridge, Green Bay, Wis., for Newspaper.

Everson, Whitney, Everson, Brehm & Pfankuch by John C. Whitney, Green Bay, Wis., for individual defendants.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

This matter is before me for resolution on its merits. The parties have submitted the case to the court in the form of a stipulated record which includes a statement of uncontested facts, a statement of contested facts, depositions and various documents and records. Briefs were also submitted.

### I. FACTS

In addition to the facts specifically mentioned below, I adopt the parties' stipulated statement of uncontested facts as part of the court's factual findings as required by Rule 52(a), Federal Rules of Civil Procedure.

The plaintiffs are forty-one former employees of the defendant Green Bay Newspaper Company. On January 25, 1972, each plaintiff was a member of a bargaining unit at the company represented by Local 23 of the International Typographical Union. As of that same date, each of the plaintiffs was a participant in the company's profit sharing plan which is an employee benefit plan as defined in the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002.

The defendants include the company, six persons who were trustees for the plan between January 25, 1972, and January 1, 1975, and the plan itself.

A collective bargaining agreement was in effect between Local 23 and the company from July 1, 1968, through July 30, 1971. Subsequent to its expiration, the parties attempted to negotiate a new agreement. On January 25, 1972, members of the union, including the plaintiffs, walked off their jobs in a lawful economic strike.

Following commencement of the strike, on January 25, 1972, February 1, 1972, and February 7, 1972, the company sent letters to each plaintiff and to the other strikers requesting that they return to their jobs. With one exception which does not affect the resolution of this case, none of the plaintiffs returned to work for the company or received compensation from the company for work performed after January 25, 1972.

Under date of September 20, 1972, the company mailed a letter to each plaintiff stating that each plaintiff as well as the other strikers had been permanently replaced. From at least September 20, 1972, until 1977, no position was available for or offered to any of the plaintiffs.

The company's profit sharing plan provides deferred compensation to eligible company employees. Benefits under the plan are distributed to participants upon retirement, disability or sickness, voluntary termination, discharge, layoff, or death. On December 18, 1973, the trustees of the plan voted to sever the interest of Rudolph Boehm, Carlton Koch, and Norman Wirch in the plan. The trustees determined that all three of these plaintiffs had voluntarily terminated their employment. Under the terms of the plan, the three were thereby entitled to receive 5% of their severance interest multiplied by the number of completed years of employment they had with the company, not to exceed 80% of what would otherwise have been their full severance interest.

On April 11, 1974, the trustees of the plan voted to sever the interest of John Mumpy in the plan, after deciding that he had voluntarily terminated his employment. On July 18, 1974, the trustees voted to sever the interest of Lionel Bushey after making the same determination regarding his employment status.

On September 20, 1974, the trustees of the plan voted to sever the interest of all thirty-six of the remaining plaintiffs in the plan. Each plaintiff so severed on September 20, 1974, received the following letter, dated September 26, 1974, from the plan:

"At a meeting of the Green Bay Newspaper Company-Profit Sharing Plan trustees on Friday, September 20, 1974, action was taken by the trustees in regard to your status in the Profit Sharing Plan and covered by language provisions of the Plan.

"Acting on reliable information that you have permanent full time employment with the Daily News of Green Bay, Wisconsin a permanent publication, the trustees have determined your status as a voluntary termination as defined in Sec. 6, Paragraph (c), Subparagraph (1) in the Plan. You are hereby entitled to receive 5% of your severance interest multiplied by the number of completed years of your employment with the company, not to exceed 80% of said severance interest.

"The enclosed check in the amount of $_____ represents the full amount of severance interest, or _____% of the amount credited to your passbook account as of December 31, 1973."

In determining the employment status of each respective plaintiff, the trustees did not have any information submitted by the plaintiffs. In gathering information regarding the plaintiffs' employment status, the trustees made no attempt to obtain information from the plaintiffs. Instead the trustees relied on reports supplied by the Retail Credit Company which were the results of investigations done by that company. Michael Gage, personnel director of the defendant company, directed the Retail Credit Company not to contact any of the plaintiffs in conducting its investigation.

Prior to the trustees' severing of the plaintiffs' interest in the plan, the plaintiffs were not notified that the trustees were contemplating such action. None of the plaintiffs were given the opportunity to be heard regarding such action before it was taken, and no opportunity to appeal was granted after it was taken.

Between November 21 and December 9, 1974, each plaintiff by letter notified the plan and the trustees as follows:

"Green Bay Newspaper Profit Sharing Plan

"Gentlemen:

"I formally protest the Trustees' action of the Green Bay Newspaper Profit Sharing Plan in determining my employment status to be that of a voluntary termination. I never did voluntarily terminate my employment but have been continuously on strike.

"I hereby notify you I have this date requested of the Green Bay Newspaper Company reinstatement to work and made unconditional application and offer to return to work and stated that I am available and willing to return to work immediately and unconditionally.

"I hereby request the Trustees rescind their determination of my status as a voluntary termination and request payment by the Trustees of the amounts treated as forfeited in my account.

"Very truly,"

The protests of the trustees' actions and the requests for rescission of the severance ruling represented by the notices received between November 21 and December 9, 1974, were never presented to the board of trustees of the plan for their consideration in a meeting. No trustee or other representative of the plan has ever responded to the notices sent by the plaintiffs.

The plaintiffs have brought this action under ERISA, 29 U.S.C. §§ 1132 and 1140. Count I of the plaintiffs' complaint alleges that the actions of the trustees in severing the plaintiffs' interest in the plan were unlawful, and it thereby seeks as relief

from the plan and the trustees the money withheld from the plaintiffs as a result of their employment status having been classified as voluntarily terminated. Count II alleges that the trustees and agents of the defendant company discriminated against the plaintiffs because of their involvement in a lawful economic strike, and it thereby seeks from all of the defendants punitive damages as well as the relief sought in count I.

## II. THE CLAIMS OF RUDOLPH BOEHM, CARLTON KOCH, NORMAN WIRCH, JOHN MUMPY and LIONEL BUSHEY

In previous decisions dated May 6, 1976, and December 14, 1978, I held that the effective date of 29 U.S.C. § 1132, under which the plaintiffs are proceeding, was September 2, 1974. The court of appeals for this circuit reached the same conclusion in *Reiherzer v. Shannon,* 581 F.2d 1266, 1272 (7th Cir. 1978). The court of appeals also held in *Reiherzer* that "a cause of action under section [1132] arises at the time the trustees of the pension plan deny an application for benefits."

■ The interests of the five above-named plaintiffs in the plan were all severed prior to September 2, 1974. Nonetheless, the plaintiffs maintain that the trustees' failure to change their decision or to grant the plaintiffs a right to appeal subsequent to their severance creates a cause of action which accrued after September 2, 1974. The plaintiffs' contention is unimpressive. Any time a board of trustees denies pension benefits, the negative effect of that decision on the claimant continues for an indefinite period of time following the trustees' decision. Yet, the court of appeals has clearly stated that a cause of action under § 1132 arises at the time the trustees deny a claimant benefits. In the instant case, that time was when the plaintiffs were severed from the plan. Since the interests of the five above-named plaintiffs were severed prior to September 2, 1974, their claims in this action must be dismissed.

## III. COUNT I

Remaining for disposition are the claims of the thirty-six plaintiffs whose interests in the plan were severed after September 2, 1974. In count I the plaintiffs maintain that the decision of the trustees to sever their interest was illegal under 29 U.S.C. § 1132.

Section six of the plan in question states a number of events in which an employee's interest in the plan may be distributed to the employee. In the event of "retirement," "sickness or disability," "layoff," or "death," an employee is entitled to his full vested interest in the plan. Section 6(c)(i) provides that

"In the event that a participating employee voluntarily terminates his employment with the Company otherwise than on account of sickness, disability or retirement or is discharged prior to reaching retirement age, he shall be entitled to have applied for his benefit 5% of his severance interest multiplied by the number of completed years of such employee's term of employment with the Company, but in no event shall he become entitled to more than 80% of his severance interest."

No further explanation or elaboration of the term "voluntary termination" is provided in the plan. On the basis of their own interpretation of that term, the trustees severed the interest of the thirty-six plaintiffs in question at a special meeting of the trustees held on September 20, 1974.

■ In reviewing the trustees' decision under § 1132, this court's inquiry is confined to a determination of whether the decision was arbitrary and capricious. *Reiherzer v. Shannon,* 581 F.2d 1266, 1272 (7th Cir. 1978); *Bueneman v. Central States, Southeast and Southwest Pension Fund,* 572 F.2d 1208 (8th Cir. 1978). For the following reasons, I find that the decision of the defendant trustees to sever the plaintiffs' interest in the plan was arbitrary and capricious.

At the August 2, 1973, meeting of the board of trustees, the chairman of the board acknowledged that "there was no

specific language in the Plan that categorically defines the strikers' status." Moreover, the "official record book" distributed by the trustees to participating employees specifically stated that forfeitures of a portion of one's interest in the plan would occur only on "resignation or discharge." Despite these facts, the trustees found that the plaintiffs had voluntarily terminated their employment, and thus required the plaintiffs to forfeit a portion of their interest in the plan. In my opinion, this course of action was inconsistent with the common law, the terms of the plan and national labor law policy.

The trustees' course of action was contrary to the common law rule of construction "that profit-sharing plans are to be liberally construed in favor of the employee . . . ." *Rosploch v. Alumatic Corp. of America,* 77 Wis.2d 76, 81, 251 N.W.2d 838, 841 (1977). Moreover, the trustees' action was inconsistent with section 4(k) of the plan which provides:

"The Trustees shall from time to time formulate and issue such rules and regulations as they may deem necessary for the purpose of administering the provisions of the Plan, but no such rule or regulation shall be effective which shall attempt to divest any participating employee from any beneficial interest or right accruing to him under the terms hereof, . . ."

Furthermore, the trustees' construction of the instant plan undermines national labor policy. 29 U.S.C. § 152(3) states that the term "employee," for the purposes of the National Labor Relations Act, "shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute . . . and who has not obtained any other regular and substantially equivalent employment . . . ." This provision has been interpreted to mean that an economic striker's status as an employee continues even though permanently replaced, until he has obtained "other regular and substantially equivalent employment." *Laidlaw Corp. v. National Labor Relations Board,* 414 F.2d 99 (7th Cir.), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1968).

The trustees' construction of the plan in effect penalized the plaintiffs for engaging in an economic strike that was protected by the National Labor Relations Act. The potential for such punitive use of a profit-sharing plan is manifest where, as in the instant case, the board of trustees is appointed by the company and consists partially of management personnel. The chairman of the board of trustees, Daniel C. Beisel, was also employed by the company as its president and publisher. Other trustees held such positions with the company as assistant comptroller and assistant circulation manager. In the absence of language in the plan regarding the status of strikers, I am persuaded that it was arbitrary and capricious for the trustees to construe the plan in a manner inconsistent with national labor policy.

This conclusion does not mean that the trustees would be forever barred from finding that striking employees had voluntarily terminated their employment with the company. 29 U.S.C. § 152(3) provides that a striker is no longer considered an employee of the struck company after obtaining "regular and substantially equivalent employment" with another company. Thus, where striking employees are engaged in such equivalent employment, the trustees might construe their status with the company as voluntarily terminated without coming into conflict with the National Labor Relations Act.

In the instant case, the trustees considered the plaintiffs' employment status before severing their interests in the plan; however, the procedure which the trustees used to evaluate the plaintiffs' cases was so inadequate that it provides additional reason for finding that the trustees' decision was arbitrary.

At a meeting of the board of trustees held on October 19, 1972, one of the plaintiffs inquired about the status of the strikers with regard to the plan. The chairman of the board stated that although the company would only contribute to the strikers' accounts in the plan to the extent that they had worked in 1972, "they continue to par-

ticipate in asset evaluation, forfeitures and income from the plan as they are still members of the Plan." Prior to their severance, the plaintiffs were not advised that the trustees were considering changing the board's policy with regard to the strikers' status under the plan. Instead the board acted unilaterally to sever the plaintiffs' interest and only advised the plaintiffs of the intended action after it was a fait accompli.

Thus, the plaintiffs never had an opportunity to comment on the trustees' proposed action or to offer evidence regarding their employment status at the time of severance. Nor did the trustees give the plaintiffs an opportunity to appeal the board's decision. The evidence indicates that the trustees ignored the protests of the plaintiffs following the decision to sever.

The information regarding the plaintiffs' other employment upon which the trustees relied in determining that the plaintiffs had voluntarily terminated their employment with the company primarily consisted of investigative reports compiled by a commercial credit reporting service. These reports in turn were frequently based on superficial interviews with the plaintiffs' neighbors, which in my opinion were not sufficient to determine accurately the plaintiffs' employment status.

The record indicates that in fact few, if any, of the thirty-six plaintiffs under consideration had secured employment which was "regular and substantially equivalent" to that which they had with the defendant company. Nearly all of these plaintiffs were working for the Green Bay *Daily News* at the time of their severance from the plan. The record indicates that the *Daily News* was started in an effort to support the strikers of the defendant company, and that the wages paid by the *Daily News* were minimal, between $28 and $32 bi-weekly for 17½ hours of work every two weeks.

■ In order to have avoided arbitrary decision-making in this matter, I believe that the trustees were obliged to have afforded the plaintiffs notice of their intention to reconsider their status under the plan and an opportunity to present evidence regarding their employment status and other pertinent matters. *See Sturgill v. Lewis*, 125 U.S.App.D.C. 335, 372 F.2d 400 (1966).

To summarize, I find that the decision of the trustees to sever the plaintiffs' interest in the plan was arbitrary and capricious. Accordingly, I find that the thirty-six plaintiffs remaining in the suit are entitled to relief from both the plan and the trustees.

## IV. COUNT II

In count II of their complaint, the plaintiffs allege that the plan, the trustees of the plan, and the company discriminated against the plaintiffs in denying them their full share under the plan in violation of §§ 1132 and 1140. The plaintiffs seek punitive damages under count II in addition to the amount of money necessary to equal 100% of the plaintiffs' severance interest. In considering count I, I found that the plan and the trustees are liable to the plaintiff. Under count II, I will consider the plaintiffs' claims against the company and their claims for punitive damages against all the defendants.

### A. *Claims Against the Company*

29 U.S.C. § 1140 provides in pertinent part

"It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act."

■ In my opinion, the plaintiffs have not sustained their burden of proof as to their claim that the company violated § 1140. The most compelling evidence in the plaintiffs' favor with regard to this claim lies in the fact that several members of the board of trustees were also part of the company's management. However, I believe that the actions of such persons as

trustees should not necessarily be attributed to the company.

Moreover, the record indicates that the company, from the commencement of the strike through at least 1977, carefully complied with the provisions of the National Labor Relations Act pertaining to the rehiring of striking employees. Several of the strikers were in fact rehired by the company. Such evidence tends to undermine the plaintiffs' contention that members of the company's management teams discriminated against the strikers and intentionally interfered with the plaintiffs' statutory pension rights.

Finally, in support of their position regarding the company's alleged discrimination in this case, the plaintiffs point to the fact that the company provided the board of trustees with the investigative reports regarding the plaintiffs' employment statuses in 1974. I do not believe that this fact justifies a conclusion that the company discriminated against the plaintiffs. As the plaintiffs themselves noted, under the National Labor Relations Act a striker's employment status with another employer is pertinent to the question whether such striker continues to be an employee of the struck company within the meaning of the Act. Therefore, the defendant company had a legitimate reason for gathering information regarding the plaintiffs' employment status. The fact that the company distributed the reports to the trustees does not justify the conclusion that the company was acting in bad faith. Sections 4(i) and 5(b) of the plan provide for the company's supplying information regarding the employment status of participants in the plan to the trustees.

Thus, I find that the plaintiffs have not proved their claims against the company, and such claims will be dismissed.

B. *Punitive Damages*

■ Count II also contains claims for punitive damages against all of the defendants. In my decision of May 6, 1976, I held that "[T]here may be extreme cases in which in order to 'enforce . . . rights under the terms of [a] plan,' within the meaning and purposes of § 1132(a)(1)(B), a court could determine that punitive damages are an appropriate and necessary sanction against persons violating § 1140."

In my judgment, the trustees' action in this case was not so malicious, flagrant or outrageous as to justify the imposition of punitive damages. Furthermore, as the next section of this decision will discuss, I believe that there is an adequate means of enforcing the plaintiffs' rights under § 1132 short of imposing punitive damages.

## V. REMEDIES

A. *Monetary Relief*

Having found that the trustees acted arbitrarily and capriciously in severing the plaintiffs' interests in the plan, I must now consider what the plaintiffs' remedy should be. Section 1132(a)(3) authorizes the court "to enjoin any act or practice which violates any provision of this title or the terms of the plan, or . . . to [grant] other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

The only plausible injunctive relief which could be applied to this case would be to require the trustees to reevaluate the plaintiffs' status under the plan, utilizing all of the due process procedures referred to previously in this decision. However, nearly five years have passed since the trustees severed the plaintiffs' interest in the plan, and I doubt that substantial justice could be accomplished by requiring that the plaintiffs be given new hearings at this late date.

■ In my opinion, the most equitable relief which can be afforded in this case is to award to each of the prevailing plaintiffs his or her full interest in the plan at the time of their severance. Such relief is appropriate in light of the twin interests described in § 1132(a)(3). It will both serve as a means of redress for those plaintiffs whose interests the trustees wrongfully forfeited and serves to enforce the procedural safeguards implicit in ERISA.

B. *Attorney's Fees*

29 U.S.C. § 1132(g) provides

"In any action under this subchapter by a participant, beneficiary, or fiduciary, the Court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

■ The attorneys for the plan and the trustees argue that before attorney's fees can be awarded under § 1132(g), a showing of bad faith on the part of the losing party should be required. I find that this contention is incorrect. Under American common law, a court has the discretion to award attorney's fees against a losing party who has acted in bad faith. *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In passing a provision for attorney's fees, I do not believe that Congress merely intended to codify this existing common law rule. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). Accordingly, I do not believe that bad faith need be shown in this case in order to recover attorney's fees.

■ The relevant criteria in determining whether attorney's fees should be granted include (1) the degree of the offending parties' culpability; (2) the ability of the offending parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the offending parties would deter other persons acting under similar circumstances; and (4) the relative merits of the parties' positions. *Eaves v. Penn*, 587 F.2d 453, 465 (10th Cir. 1978). Applying these criteria to the facts of this case, I believe that an award of attorney's fees is justified.

■ In determining the appropriate amount for such attorney's fees, I believe that the criteria set out by the court of appeals in *Waters v. Wisconsin Steel Works of International Harvester Co.*, 502 F.2d 1309, 1322 (7th Cir. 1974), cert. denied, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1975), are applicable. Applying those criteria to the case at bar, I believe that an award of attorney's fees against the plan and its trustees in the amount of $10,000 is proper.

## C. *Interest*

■ The plaintiffs contend that prejudgment interest should be granted in this case. The defendant plan and trustees have not advanced any argument as to why the plaintiffs should be denied interest from the date of the severance of their interest in the plan. I believe that in view of the fact that the amount of each of the plaintiffs' full interest under the plan was certain on the date of severance, prejudgment interest from that date is appropriate in this case. *Fattore Co., Inc. v. Metropolitan Sewerage Commission*, 505 F.2d 1 (7th Cir. 1974). I decline to require such interest to be compounded. Accordingly, each of the prevailing plaintiffs will be awarded 6% annual interest, with that figure to be applied for the period commencing on the date of severance, September 20, 1974, and terminating on the date of judgment.

## VI. MOTION TO AMEND THE COMPLAINT

■ The plaintiffs have moved to amend their pleadings to the extent necessary to cause them to conform to the evidence. Since my review of the merits of this case did not encompass any issues which were not in the existing pleadings, this motion will be dismissed as moot.

## VII. CONCLUSION

Therefore, IT IS ORDERED that the claims of Rudolph Boehm, Carlton Koch, Norman Wirch, John Mumpy and Lionel Bushey be and hereby are dismissed.

IT IS ALSO ORDERED that as to the defendant Green Bay Newspaper Company this action be and hereby is dismissed.

IT IS FURTHER ORDERED that the remaining thirty-six plaintiffs recover from the defendant plan and the defendant trustees that amount of money forfeited by the plaintiffs as a result of the trustees' decision to classify the plaintiffs' employment status as voluntarily terminated.

IT IS FURTHER ORDERED that the plaintiffs recover 6% interest on that money to be calculated from September 20, 1974, to the date of judgment from the defendant plan and the defendant trustees.

IT IS FURTHER ORDERED that the plaintiffs recover attorney's fees in the amount of $10,000 from the defendant plan and the defendant trustees.

IT IS FURTHER ORDERED that the plaintiffs' motion to amend their complaint be and hereby is dismissed as moot.