**Don C. LeFEBRE, Plaintiff,**

**v.**

**WESTINGHOUSE ELECTRIC CORP., Management Disability Benefits Plan; Westinghouse Electric Corporation; Metropolitan Life Insurance Company, A New York Corporation; and The Equitable Life Assurance Society of the United States, A New York Corporation, Defendants.**

**Civ. No. JH–79–496.**

United States District Court, D. Maryland.

Sept. 29, 1982.

Supplemental Opinion Oct. 25, 1982.

John T. Ward, John C. Baldwin, and Ober, Grimes & Shriver, Baltimore, Md., for plaintiff.

Barrett W. Freedlander, Joseph T. Brennan, II, and Niles, Barton & Wilmer, Baltimore, Md., for defendants Westinghouse Elec. Corp., The Equitable Life Assur. Society of the United States, and Metropolitan Life Ins. Co.

Joseph G. Williams, Jr., New York City, for defendants Metropolitan Life Ins. Co. and The Equitable Life Assur. Society of the United States.

JOSEPH C. HOWARD, District Judge.

## I. *Introduction*

Don C. LeFebre brought this action against Westinghouse Electric Corporation Management Disability Benefits Plan ("Plan"), Westinghouse Electric Corporation ("Westinghouse"), Metropolitan Life Insurance Company ("Metropolitan"), and The Equitable Life Assurance Society of the United States ("Equitable"), alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiff asserted three distinct claims. First, that he was denied disability benefits to which he was entitled. Second, that defendants Westinghouse, Metropolitan, and Equitable breached their fiduciary duties. And third, that the three defendants should be fined for each day that they failed to comply with ERISA disclosure requirements. The Court has exclusive jurisdiction pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e).

A court trial was held on October 20–23, 1981. The Court's findings of fact and conclusions of law (not necessarily so denominated) here follow, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## II. *Background*

In 1953, plaintiff, Don C. LeFebre, commenced employment as a technical writer with defendant Westinghouse. He continued to work for Westinghouse, assuming additional responsibilities, until November 1975, when he declared himself disabled, and his employment terminated. From 1961 onward, he developed and was employed in the audio-visual department, the function of which was to produce professional grade technical motion pictures. He was required to have professional level skills in cinematography, animation, film production, videotape and kinescope recording, editing and conforming, and film and tape instrumentation. The greater part of his work involved the use of sophisticated camera equipment to do aerial image animation work.

Plaintiff was insured under the Plan, and was at all times pertinent to this case eligible for benefits. The Plan is an employee welfare benefit plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1). It was sponsored by Westinghouse, and underwritten by Metropolitan since at least September 1, 1969, and by Equitable since December 1, 1975, the latter having responsibility for adjudicating claims.

The Plan provided four benefits to management employees who became totally disabled: (1) the Disability Income Benefit, equal to sixty percent of the employee's basic monthly salary at the time of disability less any amount actually received from sources such as Social Security; (2) the Medical Benefit which paralleled the Westinghouse Insurance Plan; (3) the Pension Disability Supplement providing benefits

based upon the Westinghouse Pension Plan; and (4) the Death Benefit providing benefits based upon the Westinghouse Insurance Plan. The Plan defined total disability as follows:

> "Disability will be considered total as long as it prevents you from performing your regular job or any reasonably appropriate work within the Company, and as long as you do not engage in work for compensation or profit with another employer or in self-employment."

Westinghouse Electric Corporation, Management Disability Benefits Plan at 8. The Plan definition of disability sets forth the so-called "easy" test for disability. In contrast to the "hard" test which requires proof of a claimant's inability to engage in *any* occupation for which he is reasonably fitted by education, training, and experience, the Plan merely requires proof that the claimant is unable to perform his particular job.

In 1961, LeFebre learned that he had retinitis pigmentosa, a progressive, incurable disease of the retina, which at first reduces peripheral vision and ultimately results in blindness. The disease did not interfere with plaintiff's work until 1970–71, when he began to have problems using the sophisticated motion picture camera equipment necessary to his work. Because of the gradual narrowing of the visual field in both eyes, LeFebre experienced difficulty centering images; and, as a result, he filmed scenes which included unwanted, extraneous objects.

In April 1972, plaintiff was examined by the Westinghouse contract physician, Dr. Richard Susel, who indicated that at that time the plaintiff's illness had reached a moderately advanced stage, and in his April 10, 1972 report to Westinghouse stated that the plaintiff "compensates well for his visual disabilities and is apparently able to perform his usual work functions." On April 13, 1972, incidental to another matter, plaintiff notified Ben Vester, a Westinghouse manager, in writing that he might have to take an early disability retirement.

During 1972 and 1973, LeFebre's eye condition worsened, further limiting the range of camera equipment he could use and increasing the amount of time needed for each project. In March 1973, plaintiff inquired about available disability benefits. In September 1973, he was declared legally blind by Dr. Susel who also determined that plaintiff was still suffering from moderately advanced retinitis pigmentosa.

By 1974 and 1975, LeFebre was unable to perform the visual aspects of his job. He could not edit film, and he had difficulty reading background material in preparation for script writing. In the words of Charles Gillespie, the colleague who worked most closely with him, by late 1975 LeFebre's film making ability "came to a screeching halt." In September 1975, Ben Vester, the Westinghouse manager with whom plaintiff had communicated previously, informed him that he could not keep his management position indefinitely, but that a non-management position might be found for him. This would have resulted in a loss to plaintiff of his disability benefits under the Plan.

LeFebre's last day of work at Westinghouse was November 21, 1975. He declared himself disabled due to retinitis pigmentosa as of November 24, 1975. In a report dated March 5, 1976, Dr. Susel stated "that visual acuity has remained [in] relatively the same state as his last visit to me," and he felt at that time that the plaintiff was still suffering from moderately advanced retinitis pigmentosa. On May 11, 1976, Westinghouse removed LeFebre from the payroll retroactive to December 18, 1975. On or about May 18, 1976, plaintiff filed his statement of claim in which Dr. Susel indicated that LeFebre was totally disabled "for any occupation."

### III. *Denial of Disability Benefits*

■ The record reveals various management memoranda circulating during June and July, 1976, indicating Westinghouse's intention to deny plaintiff's disability claim. On July 19, 1976, Howard Jenkner of the Westinghouse insurance office in Pittsburgh, forwarded plaintiff's claim to Michael Susarchick, manager at Equitable,

with a letter stating that: (1) LeFebre's last day of work was December 1, 1975; (2) he "was able to perform all of his duties without difficulty"; (3) he "did not consult an eye specialist until February 18, 1976"; and (4) he could be performing his duties "if he had not committed murder." The last item is a reference to the fatal shooting by LeFebre on December 4, 1975, of his wife's lover, for which he was imprisoned. Jenkner also expressed doubt about the validity of plaintiff's claim.

The Court finds the aforementioned assertions provided by Westinghouse to Equitable to be inaccurate at best and false at worst. In fact (1) LeFebre's last day of work was November 21, 1975; (2) he was unable to perform most of his duties by the fall of 1975; (3) his eyes were examined by a Westinghouse physician as early as April 1972; and (4) the crime he committed on December 4, 1975, is irrelevant to the question of his ability to perform his duties.

On November 10, 1976, after plaintiff had begun receiving total disability benefits under Social Security, and after inquiries had been made by plaintiff's attorney concerning the status of his client's claim, Westinghouse notified plaintiff that Equitable had denied his claim, having found that plaintiff had been able to perform his duties prior to December 4, 1975.

The Court notes the following: plaintiff filed his claim with Westinghouse on approximately May 18, 1976; it was forwarded to Equitable on July 19, 1976; Susarchick decided to deny the claim in August 1976; and plaintiff was notified of the denial on November 10, 1976. Susarchick stated that the August-November delay was caused by the difficulty he had in obtaining a copy of plaintiff's murder trial transcript, and by his investigation of plaintiff's emotional condition in anticipation of a disability claim based on that ground.

Susarchick based his decision to reject plaintiff's disability claim on the following: (1) Howard Jenkner's letter of July 19, 1976; (2) Dr. Susel's report of April 1972; (3) the fact that in June 1974, and October 1975, plaintiff received "merit" increases; and (4) the fact that in December 1975, plaintiff was able to drive a car and fatally shoot another person.

After plaintiff's claim was denied, his lawyer unsuccessfully sought relief from other sources, whereupon, on April 6, 1977, he formally requested reconsideration of his client's claim by Westinghouse and Equitable. On that date, plaintiff's lawyer also requested claim-related information from Westinghouse pursuant to 29 U.S.C. § 1132(c), which requires that such information be mailed to a Plan participant within thirty (30) days after receipt of his request. Some of the requested information was forwarded to the plaintiff on July 13, 1977, but certain items were not, most noticeably, plaintiff's time records and a Summary Plan Description. The former was provided well after the instant suit was filed, the latter was not provided because Equitable believed it was not required to do so.

In reconsidering plaintiff's claim, Equitable obtained Dr. Susel's 1973 and 1976 reports, and consulted its physician, Dr. William Browne. While acknowledging that LeFebre was severely impaired by his decreased visual field, Dr. Browne found no evidence that the plaintiff was unable to work during the period in question; and concluded that plaintiff was not disabled even under the so-called "easy" test of the Plan definition of disability discussed above. Equitable again denied plaintiff's claim on July 13, 1977.

Sometime in 1980, Dr. Daniel Finkelstein, an expert on retinitis pigmentosa, reviewed Dr. Susel's documentation of plaintiff's illness, and concluded that LeFebre was disabled as of December 1975. On October 18, 1981, without examining the plaintiff, Finkelstein discussed with him what his job requirements had been at Westinghouse. This resulted in no change in his previous assessment of total disability.

It is evident that Dr. Browne based his decision on the same information that Susarchick relied on. As that information was erroneous, the conclusion reached by both individuals is incorrect.

First, as stated earlier, the critical assertions in Jenkner's July 19, 1976 letter were in error. Second, Susarchick's and Browne's reliance on a 1972 report to evaluate the plaintiff's condition in 1975 was misplaced. Third, the June 1974, and October 1975 "merit" increases were less a matter of merit than of maintaining plaintiff's position on a pay scale. Moreover, as Westinghouse knew, possibly as early as April 1972, but certainly by March 1973, that plaintiff was likely to file a disability claim, the Court is disinclined to attach much weight to Westinghouse's characterization of the increases. Fourth, the significance of plaintiff's ability to drive an automobile is diminished by the fact that the plaintiff had had three automobile accidents, and had been enjoined by a Maryland court from driving with his children.

It is as important to recognize what information defendants chose to ignore as it is to take note of what they relied upon. Neither Westinghouse nor Equitable sought any information whatsoever from LeFebre or Dr. Susel personally, or from any of LeFebre's co-workers to determine just what he was able to do on the job. Testimony from those individuals, considered in conjunction with the evaluation by Drs. Susel and Finkelstein, establishes conclusively that LeFebre was indeed disabled under the Plan as of November 1975.

### IV. *Breach of Fiduciary Duty*

ERISA, enacted on September 2, 1974, is the comprehensive remedial statute designed to protect the interests of participants in employee benefit plans. *Marshall v. Kelly,* 465 F.Supp. 341, 349 (W.D.Okl. 1978). In enacting ERISA, the focus of Congress was on the "conduct, responsibility, and obligation" of the fiduciaries who were responsible for administering such plans. ERISA, 29 U.S.C. § 1001(b); *Cate v. Blue Cross & Blue Shield of Alabama,* 434 F.Supp. 1187, 1190 (E.D.Tenn.1977). The fiduciary responsibility provisions of the Act took effect on January 1, 1975, 29 U.S.C. § 1114; *Toland v. McCarthy,* 499 F.Supp. 1183, 1191 (D.Mass.1980); and are applicable to the instant action.

It is undisputed that at all relevant times Westinghouse and Equitable were Plan fiduciaries within the meaning of § 3(21) of ERISA which provides in pertinent part that:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Section 3(21) ERISA, 29 U.S.C. § 1002(21).

As no evidence whatsoever was adduced establishing fiduciary responsibility in Metropolitan, or proving any unlawful conduct on its part, the claims against it will be dismissed.

As fiduciaries, Westinghouse and Equitable were obliged to act in accordance with the following standard:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . .

ERISA, 29 U.S.C. § 1104(a)(1); *Brink v. DaLesio,* 496 F.Supp. 1350, 1367 (D.Md. 1980) (Young, J.).

As co-fiduciaries administering the Plan, Westinghouse and Equitable each had responsibility for the actions of the other. ERISA provides that a fiduciary shall be liable for another fiduciary's breach of responsibility (1) if he participates knowingly in a breach, or (2) if, by his failure to comply with § 1104(a)(1), *supra,* he enables the other fiduciary to commit a breach. ERISA, 29 U.S.C. § 1105(a). Good faith does not constitute a defense to breach of fiduciary duty. *M & R Inv. Co. v. Fitzsimmons,* 484 F.Supp. 1041, 1055 (D.Nev.1980).

■ Implicit in the standard for fiduciary responsibility set forth under § 1104(a)(1), *supra,* is the duty of fiduciaries "to take an initiative themselves to cause reasonably available evidence—this is, evidence substantially bearing upon the plaintiff's claim and available through reasonable efforts—to be developed and considered in the decisionmaking process." *Toland v. McCarthy,* 499 F.Supp. 1183, 1190 (D.Mass.1980). In determining whether Equitable's decision to deny plaintiff's claim should be upheld, this Court is free to consider all the information that would have been available to Westinghouse and Equitable had they made reasonable efforts to obtain it. *Id.* at 1190 n. 5.

■ While courts have been understandably reluctant to interfere with the administration of disability plans, they have not hesitated to reject arbitrary and capricious actions of plan administrators. *Horn v. Mullins,* 650 F.2d 35 (4th Cir.1981); *Frary v. Shorr Paper Products, Inc.,* 494 F.Supp. 565, 569 (N.D.Ill.1980). Review under this standard requires a determination of whether the disability decision was based upon a "consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). A challenged decision will remain intact unless it is "unwarranted in law or without justification in fact." *Goodman v. United States,* 518 F.2d 505, 511 (5th Cir.1975). However, even where there is substantial evidence supporting denial of a disability claim, disregard of very persuasive evidence tending to support a disability award will render the claim rejection arbitrary and capricious. *See Beggs v. Mullins,* 499 F.Supp. 916, 920 (S.D.W.Va. 1980).

At issue then, is whether Westinghouse and Equitable breached their fiduciary duty to develop available evidence of plaintiff's disability. If they did, denial of plaintiff's claim was arbitrary and capricious as a matter of law, *Toland, supra,* 499 F.Supp. at 1190, and should be reversed.

■ Having considered the evidence adduced, the Court concludes, for the reasons which follow, that Westinghouse and Equitable did breach their fiduciary obligation, and that their decision was arbitrary and capricious.

First, as discussed earlier, in breach of their fiduciary responsibility, Westinghouse supplied, and Equitable relied upon, erroneous, incomplete, and, in some instances, irrelevant information in reaching their decision.

Second, by considering only the aforementioned factors, the defendants improperly applied the Plan standard of disability. In particular, by basing their decision on factors unrelated to a determination of whether the plaintiff could perform his job, defendants imposed a higher standard of disability on the plaintiff than the Plan required. This constitutes an arbitrary and capricious construction of the Plan. *Morgan v. Mullins,* 643 F.2d 1320, 1321 (8th Cir.1981).

Third, defendants failed to fully carry out their fiduciary duty to develop persuasive evidence tending to support pension entitlement. They neither sought specific information, nor developed available information concerning plaintiff's ability to do his job. This, too, renders the claim denial arbitrary and capricious. *Beggs,* 499 F.Supp. at 920.

Finally, Equitable failed to supply plaintiff with claim related documents and information within thirty (30) days of his request in violation of § 502(c) of ERISA, 29 U.S.C. § 1132(c), and in dereliction of its fiduciary duty. Equitable's failure to provide a copy of the Summary Plan description as requested, violated 29 U.S.C. § 1024(b)(4), which requires that a Plan participant be furnished a copy upon written request.

Equitable's argument that the provisions of 29 CFR § 2520.104–5(a) and (b) nullify its obligation to provide the Summary Plan Description is spurious. Section 2520.104–5(b)(i) of 29 CFR requires that an ERISA Notice be provided by May 30, 1976, to each participant covered under the Plan as of March 2, 1976. ·Where an ERISA Notice

was provided for *each* person in the Plan, the deadline for providing a Summary Plan Description was deferred until November 1977.

■ It is uncontested that LeFebre did not receive the ERISA Notice; therefore, there was no justification for a delay in providing the Plan Description, and certainly none for Equitable's failure to provide the Description at all. 29 CFR § 2520.104–5(a). Equitable's good faith belief that it was not required to supply a Summary Plan Description does not relieve it of liability, for, as noted earlier, good faith is not a defense to breach of fiduciary duty. *Fitzsimmons,* 484 F.Supp. at 1055.

### V. *Damages and Other Relief*

*First Claim*

■ To remedy defendants' failure to award plaintiff disability benefits, the Court will order that plaintiff be given all benefits to which he is entitled under the Plan, *viz:* (1) the Disability Income Benefit; (2) the Medical Benefit; (3) the Pension Disability Supplement; and (4) the Death Benefit.

*Second Claim*

Pursuant to 29 U.S.C. § 1132(a)(3), plaintiff will be awarded his full interest in the Plan as of May 1976, as outlined in the preceding paragraph. *Baeten v. Van Ess,* 474 F.Supp. 1324, 1331 (E.D.Wis.1979). The parties will be afforded the opportunity to file supplemental memoranda on this issue.

*Third Claim*

■ Defendants' delay in providing certain claim-related documents and failure to provide the Summary Plan Description are undisputed. Defendants' argument that a plaintiff may not claim benefits in addition to penalty damages under § 1132 of ERISA because the relevant subsections of that provision are joined by the disjunctive "or" is unsupported by the law and contradicted by fundamental rules of statutory construction. *See,* R. Dickerson, Interpretation and Application of Statutes, 233 (1975); 1 A.C. Sands, Sutherland Statutory Construction,

§ 21.14 (4th ed. 1972). Therefore, pursuant to 29 U.S.C. § 1132(c), the Court will impose a fine of $74,000 based on an assessment of $100 per day for each day beyond the first thirty that defendants delayed or failed to provide requested documents.

■ All claims for prejudgment interest, as well as the claims for storage costs and for the loss relating to the sale of plaintiff's house, will be denied.

Plaintiff's attorneys are entitled to reasonable attorneys' fees under § 502(g) of ERISA, 29 U.S.C. § 1132(g); *Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344, 1356 (8th Cir.1980). Upon receipt and review of memoranda detailing fees and costs, and defendants' opposition thereto, the Court will make a reasonable award.

### VI. *Conclusion*

For the foregoing reasons, the Court concludes that Don C. LeFebre was denied disability benefits to which he was entitled; that defendants Westinghouse and Equitable breached their fiduciary duties; and that Westinghouse and Equitable should be fined for each day that they failed to comply with ERISA disclosure requirements.

Accordingly, it is this 29th day of September, 1982, by the United States District Court for the District of Maryland.

ORDERED:

1) that defendants Westinghouse Electric Corporation and The Equitable Life Assurance Society of the United States are deemed liable to plaintiff Don C. LeFebre for benefits under the Westinghouse Electric Corporation Management Disability Benefits Plan, and that both plaintiff and defendants are hereby directed to supply memoranda to the Court within ten (10) days of the date of this Order, setting forth their positions concerning the amount of damages;

2) that plaintiff's requests for prejudgment interest, storage costs, and loss relating to the sale of his house are hereby DENIED;

3) that counsel for plaintiff are entitled to reasonable attorneys' fees and are hereby

directed to supply memoranda and affidavits to the Court within ten (10) days in support thereof;

4) that plaintiff's claims against defendant Metropolitan Life Insurance Company are hereby DISMISSED;

5) that upon the determination of final damages and attorneys' fees, the Court will award sanctions in the amount of $74,000 against the defendants and direct entry of final judgment; and

6) that the Clerk of the Court shall mail copies of this Memorandum and Order to all parties.

## SUPPLEMENTAL OPINION

### I.

On September 29, 1982 this Court entered its Memorandum Opinion, holding, *inter alia,* that plaintiff's rights under the Employees Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* (1976), were breached by the conduct of the defendants. At page 1024 of its opinion, the Court held:

*First Claim*

To remedy defendants' failure to award plaintiff disability benefits, the Court will order that plaintiff be given all benefits to which he is entitled under the Plan, *viz:* (1) the Disability Income Benefit; (2) the Medical Benefit; (3) the Pension Disability Supplement; and (4) the Death Benefit.

*Second Claim*

Pursuant to 29 U.S.C. § 1132(a)(3), plaintiff will be awarded his full interest in the Plan as of May 1976, as outlined in the preceding paragraph. *Baeten v. Van Ess,* 474 F.Supp. 1324, 1331 (E.D.Wisc. 1979). The parties will be afforded the opportunity to file supplemental memoranda on this issue.

As to plaintiff's claim for a civil penalty for defendants' failure to provide requested ERISA documents, the Court held that plaintiff was entitled to a recovery in the amount of $74,000.00. *Id.* Finally, the Court held, opinion at 1028, that plaintiff is entitled to an award of reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g). On the issue of the amount of damages under plaintiff's second claim, *i.e.,* for full interest in the Plan as of May, 1976, and as to the amount of plaintiff's attorneys' fees recoverable, the Court requested supplemental memoranda. The Court has received memoranda from plaintiff on both these issues. The defendants' position, as stated in several letters to the Court, is that the plaintiff is not entitled to "prove" damages by way of post-trial memoranda. Nonetheless, the defendants have filed a supplemental memorandum on the amount of damages. The Court has considered both memoranda. The Court views the damages recoverable under ERISA as essentially a species of liquidated damages, and the Court is of the opinion that there was adequate proof of the extent, if not the money amount, of damages at the trial. Having reviewed the memoranda quantifying the damages in money terms, the Court will base its decision on plaintiff's submission. On the issue of attorneys' fees, the Court has considered the positions of both parties, and its decision will be set forth and explained *post.*

### II.

With regard to damages, the Court finds that the amount of damages, without adjustment either for prepayment or inflation, owing to plaintiff on account of his first claim as follows:

| | | |
|---|---|---|
| 1) | Disability Income Benefit | $126,432.72 |
| 2) | Medical Benefit | 7,914.33 |
| 3) | Pension Disability Supplement | 59,038.20 |
| 4) | Death Benefit | 27,000.00 |
| | TOTAL | $220,385.25 |

It is evident that the figures recited above fully compensate plaintiff on the first and second claim is described at page 11 of this Court's September 29, 1982 Memorandum Opinion. Therefore, the Court will accept the plaintiff's substantive damage figure of $220,385.25.

The more difficult question in this case is how to balance the pre-payment and future inflation factors with regard to that portion

of the plaintiff's total award that relates to future damages. Although there would appear to be no Fourth Circuit case in point, most federal appellate courts have embraced the principle that damage awards must account for inflation. *See, e.g., Alma v. Manufacturers Hanover Trust Co.,* 684 F.2d 622, 626 (9th Cir.1982). *See also Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30 (2nd Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981); *Pfeifer v. Jones & Laughlin Steel Corp.,* 678 F.2d 453 (3rd Cir.1982) (overruling *Magill v. Westinghouse Electric Corp.,* 464 F.2d 294 (3rd Cir.1972)); *Culver v. Slater Boat Co.,* 688 F.2d 280 (5th Cir.1982) (en banc) (overruling *Johnson v. Penrod Drilling Co.,* 469 F.2d 897 (5th Cir.1972)); *Bach v. Penn Central Transportation Co.,* 502 F.2d 1117, 1122 (6th Cir.1974); *O'Shea v. Riverway Towing Co.,* 677 F.2d 1194 (7th Cir.1982); *Riha v. Jasper Blackburn Corp.,* 516 F.2d 840 (8th Cir.1975); and *Steckler v. United States,* 549 F.2d 1372 (10th Cir.1977). In light of this substantial body of authority, this Court is convinced that it is appropriate to take inflation into account in making an adjustment of plaintiff's award of future damages. The significance of such an adjustment is, of course, its levelling effect when contrasted to the effect of discounting an award of future damages to present value. It has long been the federal rule that damage awards should be discounted. *See Chesapeake & Ohio Railway Company v. Kelly,* 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916). *See also Moore v. Townsend,* 577 F.2d 424, 427 (7th Cir.1978). In the Fourth Circuit, the rule appears not to have been the subject of any recent published opinion, but it is discussed in a footnote in the unpublished opinion in *Wayland v. Mortensen, et al.,* 679 F.2d 891 (1982) (copy attached).

The plaintiff suggests that the appropriate balance between discounting to present value and increasing the award to account for inflation is to be found in simply refusing to discount to present value at all. In support of that contention, the plaintiff cites the Third Circuit's opinion in *Pfeifer v. Jones & Laughlin Steel Corp.,* 678 F.2d at 461. *Accord Barnes v. United States,* 685 F.2d 66 (3rd Cir.1982). There are certain commentators who have also advocated the "total offset" approach. *See, e.g.,* Carlson, *Economic Analysis v. Courtroom Controversy: The Present Value of Future Earnings,* 62 A.B.A. J. 628 (May 1976). The Court finds that total offset is appropriate in the circumstances of this case as to all of the elements of damages comprehended in the total award set forth above. In so holding, the Court intends its holding to be limited to the facts of this case, in which it found a breach of the defendants' fiduciary responsibility, resulting in damage to an individual clearly within the scope of ERISA's remedial protection. *See Marshall v. Kelly,* 465 F.Supp. 341, 349 (W.D.Okla.1978). The Court might adopt a different approach in other cases within the Court's federal question jurisdiction. And, of course, the Court would defer to state law on the issue in cases within its diversity jurisdiction. But, in this case, especially in view of the absence of any suggestion by the defendants that the award to Mr. LeFebre ought to be reduced to present value, the Court will adopt the "total offset" approach. Therefore, the Court finds that Mr. LeFebre is entitled to recovery in the amount of $220,385.25 in consequence of his first and second claims.

### III.

In view of its previous determination with regard to the failure to disclose Plan documents, the plaintiff is entitled to recover from the defendants the amount of $74,000.00, in addition to the damages identified immediately above.

### IV.

With regard to attorneys' fees, the Court has considered the plaintiff's detailed submission in light of the rule in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir.), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978), as explicated in *Anderson v. Morris,* 658 F.2d 246, 249 (4th Cir. 1981). Although the Court recognizes that the Fifth Circuit has adopted a separate set

of criteria for awarding fees in ERISA cases, *see Iron Workers Local No. 292 v. Bowen,* 624 F.2d 1255 (5th Cir.1980), it is also true that *Bowen,* if read as replacing a *Barber*-type analysis for calculating the *amount* of fees to be awarded, is unreconcilable with prior Fifth Circuit authority adopting a *Barber*-type analysis for all statutory attorney fee awards. *McGowan v. Credit Center of North Jackson, Inc.,* 546 F.2d 73, 77 (5th Cir.1971). Defendants here misread *Bowen* as applying to the *calculation* of fees. A careful reading shows it to apply only to the question of *whether* fees should be awarded. 624 F.2d at 1266. In the absence of Fourth Circuit authority on the point, this Court will apply *Barber,* as modified in *Anderson,* in calculating the fees due plaintiff's attorneys.

Before the decision in *Anderson,* the district courts were faced with the almost impossible task of applying the 12 amorphous "*Barber* factors" without substantial guidelines on the order in which those factors ought to be assessed, and the relative weight to be accorded to each. In *Anderson,* the Fourth Circuit told the district courts to:

> [F]irst ascertain the nature and extent of the services supplied by the attorney from a statement showing the number of hours worked and an explanation of how these hours were spent. The court should next determine the customary hourly rate of compensation. These are essentially [*Barber*] factors 1 and 5. The court should then multiply the number of hours reasonably expended by the customary hourly rate to determine an initial amount for the fee award.
>
> Finally, the court should adjust the fee on the basis of the other factors, briefly explaining how they affected the award.

658 F.2d at 249.

The plaintiff has supplied the Court with a computer print-out showing the following:

1) Net unbilled disbursements ...$  7,412.98
2) Number of attorney hours expended (1,622.5)
3) Fees for above .............$150,404.00

The fees calculated above were on the basis of hourly rates of $105, $100, and $90 per hour for the services of the three attorneys who performed the great bulk of the legal effect invested in this case. The plaintiff's attorneys supplied the affidavit of a prominent Baltimore attorney in a firm other than their own, attesting that those hourly rates are reasonable and are "well within the range of rates charged by other firms of similar character" to plaintiff's attorneys' firm.

Of course, the fact that the hourly rates are customary does not mean that final client bills are always calculated by multiplying the hourly rates times the number of hours expended on a client's business. This common sense factor is reflected by the requirement in *Anderson* that the Court be given "an explanation of how these hours are spent." *Id.* In analyzing the voluminous computer print-outs furnished by plaintiff's attorneys as Exhibit A to their memorandum in support of reasonable attorneys' fees, the Court finds that the bulk of the entries therein were in the nature of internal conferences, telephone conferences, document analysis, and other non-intensive general operations. Without engaging in an item-to-item analysis of the literally thousands of entries in the computer print-out, but considering the overall breakdown of the work performed by plaintiff's attorneys in this case, the Court is of the opinion that an hourly rate of $75 would fairly balance *Barber* factors 1 and 5 in light of the Fourth Circuit's exegesis of those factors in *Anderson.* Therefore, the "initial amount for the fee award" in this case, also called the "lodestar amount," is derived by applying the hourly rate of $75 to a time figure of 1,622.5 hours, resulting in a "lodestar" amount of $121,687.50. The 1,622.5 hours involved in this case also includes time spent by plaintiff's attorneys in submitting supplemental memoranda and in preparing their request for attorneys' fees. The post trial matters may properly be included in computing their fee awards.

Having arrived at that figure, the Court must determine whether it should be adjusted by the remaining 10 *Barber* factors.

*Anderson v. Morris,* 658 F.2d at 249. The questions raised in this litigation were neither very novel nor difficult, and the trial was not protracted. Of course, the skills of plaintiff's attorneys were apparent to the Court at trial and remain so apparent. It is evident that plaintiff's attorneys lost some opportunities in pressing the instant litigation, but their position is not nearly analogous to, *e.g.,* that of the sole practitioner who takes on a time-consuming prisoner civil rights case with virtually no hope of remuneration from his client and little hope of recovery of any fee. The same analysis applies to *Barber* factor 10, the "undesirability of the case within the legal community." With regard to the nature and length of the attorney-client relationship and the attorney's expectations at the outset, as well as the time limitations imposed by the client, the Court notes that the plaintiff is an individual client, unlikely to bring repeat business to the firm, who came to the firm only after his former attorney decided to consult an ERISA specialist. Of course, the experience, reputations, and abilities of plaintiff's attorneys are beyond serious cavil. Finally, with regard to attorneys' fee awards in similar cases, there is not a substantial body of case law in this Circuit with specific regard to ERISA attorney's fee recovery.

Considering all of the *Barber* factors, the Court is of the opinion that no increase in the "lodestar" figure is warranted. Therefore, the Court will award a fee of $121,- 687.50. Additionally, plaintiff is entitled to recover the fees paid to his first attorney, Mr. Frame, in 1976, in the amount of $2,161.39. Under all the circumstances, the Court is of the opinion that the fees paid to Frame were reasonable and proper, and in view of the time that has passed since they were paid over by the plaintiff to Frame and in view of the relatively small amount involved, the Court is of the opinion that it need not make a detailed analysis of such an award as in *Anderson* and *Barber.* Therefore, plaintiff is also entitled to recover the sum of $2,161.39.

## V.

For the reasons stated above, a judgment conforming to this Memorandum opinion will be entered separately. Fed.R.Civ.P. 58.

## JUDGMENT

In accordance with the foregoing Memorandum, IT IS, this 25th day of October, 1982, by the United States District Court for the District of Maryland, ORDERED and ADJUDGED:

1. That plaintiff BE, and he hereby IS, awarded the sum of $220,385.25 in consequence of his first and second claims;

2. That plaintiff BE, and he hereby IS, awarded the additional sum of $74,000.00 in consequence of the defendants' failure to disclose Management Disability Benefit Plan documents;

3. That plaintiff's attorneys BE, and they hereby ARE, awarded the sum of $121,687.50 as attorneys' fees;

4. That plaintiff BE, and he hereby IS, further awarded the sum of $2,161.39 as reimbursement of attorney's fees paid to his previous attorney; and

5. That the Clerk of Court mail copies of the foregoing Memorandum and of this Judgment to counsel for the parties.